IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

v.                                  CRIMINAL ACTION NO. 2:22-cr-00094

KELLEY JEAN MILLER,

               Defendant.

MEMORANDUM OPINION AND ORDER

The Court has reviewed the *Defendant's Motion to Suppress Evidence* (Document 35), the *Response of the United States of America to Defendant's Motion to Suppress* (Document 40), the *Defendant's Reply to the Government's Response to Defendant's Motion to Suppress* (Document 42), and all attached exhibits.  In addition, the Court has considered the evidence and testimony presented during the suppression hearing held on August 9, 2022.  For the reasons stated herein, the Court finds that the motion should be granted, and the challenged evidence should be suppressed.

FACTUAL BACKGROUND

On May 3, 2022, Kelley Jean Miller was charged in a single count indictment alleging that she "knowingly and intentionally possessed with the intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance" in violation of 21 U.S.C. § 841(a)(1). (Document 1). She filed a motion to suppress evidence on July 25, 2022, and the Court held a

hearing on the motion on August 9, 2022. She seeks to suppress all evidence obtained during a traffic stop on July 11, 2021, as well as that obtained during subsequent searches of the vehicle.

During the suppression hearing, in addition to viewing body camera footage from the traffic stop and other relevant evidence, the Court heard the testimony of three law enforcement officers involved in the stop and search, namely Officer Logan Skurupey, Officer Tyler Thomas, and Trooper Tony Kirkwood, as well as that of the passenger in the Defendant's vehicle, Kevin Michael Davis. The briefing of the parties, and the evidence and testimony presented at the hearing, reveal the following.[1]

On the evening of July 11, 2021, at approximately 9:30 P.M., Ripley Police Department officers Logan Skurupey and Tyler Thomas, along with West Virginia State Police Trooper Tony Kirkwood, were parked in the median of I-77 in Jackson County, West Virginia, monitoring passing traffic.[2]  Each officer was in a separate vehicle. The officers observed the Defendant, Kelley Jean Miller, driving a black SUV. Officer Skurupey believed that the vehicle was speeding, had an illegal window tint, and had malfunctioning vehicle registration lights. He  initiated a traffic stop based upon those alleged infractions. The other officers followed in their vehicles.

After Ms. Miller pulled over, Officer Skurupey approached the driver side window while the other two officers approached the front passenger side window where they encountered the passenger, Kevin Michael Davis.[3]  Officer Skurupey asked Ms. Miller to lower her rear windows

---

1 These facts reflect the Court's general findings related to the timeline of events depicted in the body camera footage and supported by the evidence. The Court's review of the relevant testimony, weight of the evidence, and credibility of witnesses is more fully detailed in the "Suppression Hearing" section of the opinion.

2 An audio-visual record of some of the relevant interactions was captured on Officer Skurupey's body camera footage and is identified as *Defense Ex. 1, Body Camera Footage (5 Videos)* (Document 58-1) [hereinafter "Skurupey Bodycam Footage"] and is broken into 5 parts. In the interest of clarity, the Court will identify aspects of the footage by citing to the bodycam footage, the relevant part, and the relevant timestamp within.

3 Of the three officers on the scene, only Officer Skurupey had a body camera that was properly functioning during the interactions and preserved thereafter. While Officer Thomas was wearing a body camera, the footage was either

2

as the tint purportedly did not allow him to see if additional passengers were in the back of the vehicle.  After Ms. Miller stated that she believed she was pulled over potentially for speeding, Officer Skurupey informed her of the three alleged traffic infractions that led to the stop and informed the Defendant that the stop would result in "just a warning." (Skurupey Bodycam Footage, pt. 1, at 0:00:55)  After informing the Defendant of this intention, but before returning to his vehicle to check the Defendant's information, Officer Skurupey asked approximately ten to fifteen additional questions of the Defendant.  He inquired about whether there was anything in the car to be aware of or anything a canine would alert on.  He asked for her consent to search the car. She shrugged her shoulders but did not respond affirmatively. He continued to inquire whether she had any drugs, then inquired about whether she had weapons, and asked numerous questions related to her travel plans and where she was going.

Meanwhile, from the other side of the car, Officer Thomas shined his flashlight in Officer Skurupey's direction, and Trooper Kirkwood appeared to be questioning Mr. Davis.  After asking several more questions, Officer Skurupey walked toward the back of the vehicle where Officer Thomas joined him. Officer Thomas told Officer Skurupey that he had smelled marijuana, and the odor had become strong when the rear windows were rolled down. Officer Skurupey responded, "[t]hat's what I thought." (Skurupey Bodycam Footage, pt. 1, at 0:01:55).

At this point, neither Ms. Miller nor Mr. Davis had been removed from the vehicle. Officer Thomas indicated that he would seek to confirm the smell and stated that needles may have been seen.  Based upon the reported smell of marijuana, the Officers decided to initiate a search and each officer returned to their previous positions at the vehicle.

---

not recorded or not properly preserved.

After she was removed from the vehicle, Officer Skurupey informed Ms. Miller of the reported smell of marijuana. Ms. Miller immediately denied the presence of marijuana and stated that neither she nor Mr. Davis had smoked marijuana. Officer Skurupey asked if she was calling his partner a liar, to which she responded that she was not, but reiterated her denial of the presence of marijuana.

During this time, Trooper Kirkwood is seen in the background continuing to engage with Mr. Davis and ultimately removing him from the car. Prior to initiating a pat down search, Trooper Kirkwood inquired whether there was anything that might hurt him. Mr. Davis informed him of a syringe located on his person and later admitted that this syringe contained methamphetamine. Officer Skurupey asked Ms. Miller if she was hiding contraband in her bra which she denied. To confirm, he asked her to "pull it out from the outside and shake for me," which she obliged, revealing no contraband. (Skurupey Bodycam Footage, pt. 1, at 00:03:48). Ms. Miller and Mr. Davis were then informed of the search and placed in separate police vehicles.

The officers discovered that Ms. Miller had an outstanding warrant in Ohio for a non-extraditable offense and discovered a large amount of cash in her purse. Officer Skurupey decided to read Ms. Miller her *Miranda* rights and question her about the cash. He informed her that she was not under arrest but was being detained during the search and gave her the *Miranda* rights. Officer Skurupey asked if she would be willing to speak with him and answer questions outside the presence of an attorney. Ms. Miller invoked her right to an attorney and Officer Skurupey explicitly acknowledged her response and informed her that the only way police could ask questions at that point was if she let them know she changed her mind. (Skurupey Bodycam Footage, pt. 1, at 00:07:40-00:08:03). Despite this, after partially searching the vehicle, Officer

4

Skurupey reapproached Ms. Miller and initiated conversation to see if she would be willing to speak without a lawyer, asking "are you still invoking your Fifth Amendment right or are you willing to speak without an attorney present?" (Skurupey Bodycam Footage, pt. 2, at 00:12:19-00:12:25).  Ms. Miller reaffirmed her earlier response.

Later, while conducting the search, and after Ms. Miller had invoked her *Miranda* right to remain silent and obtain an attorney on at least two occasions, Officers Skurupey and Thomas discussed her request for a Mountain Dew soda.  The discussion, as captured on the video footage proceeded as follows:

|  |  |
|---|---|
| Thomas: | Apparently, she plead the fifth… |
| Skurupey: | Yea, she wouldn't, I read her her rights and she wouldn't talk to me. |
| Thomas: | She wants some Mountain Dew out of the back. |
| Skurupey: | Nope. I mean I'd check it. |
| Thomas: | Well, yeah, but. |
| Skurupey: | She can't have it now. |
| Thomas: | I'm just wondering if we coddle her a little bit, she'll fuckin', maybe she'll start talking. |

(Skurupey Bodycam Footage, pt. 2, at 00:21:50-00:22:00). This followed Officer Skurupey's previous comment regarding how hot it was at this time of the evening, and another officer's seeming agreement. (Skurupey Bodycam Footage, pt. 2, at 00:05:34) ("God it's hot.").

The search of the vehicle uncovered smoking devices, $10,000 in cash in the Defendant's purse, as well as LSD and methamphetamine.  Some of the drugs were located inside a fake Brisk Iced Tea can.  Ultimately, Ms. Miller was placed under arrest and taken to the police station.

At the station, Officer Skurupey made another attempt to persuade Ms. Miller to speak with him despite her previous assertion of her right not to speak without an attorney. After inquiring whether she remembered her rights, and without an attorney present, he stated: "You willing to talk to me? I just got a couple questions to ask you about that car, and what we found in it." (Skurupey Bodycam Footage, pt. 5, at 00:01:00). He then proceeded to interrogate her extensively for several minutes, without an attorney present, about the contents of the vehicle, the contraband, and the cash. (Skurupey Bodycam Footage, pt. 5, at 00:01:15-00:05:25).

The body camera footage concludes as Officer Skurupey enters a secure room, where Officer Thomas was seated. The first and only thing Officer Thomas states is a request for Officer Skurupey to turn off his body camera stating, "[t]urn it off if you can." (Skurupey Bodycam Footage, pt. 5, at 00:08:20). Officer Skurupey appears to oblige the request and the video abruptly concludes.

Officer Skurupey filed the only report following the arrest. In the report, he falsely indicated, among other things, that when Ms. Miller was asked if she consented to the search, "she stated yes." (Document 58-5, at p. 5). He then sought and obtained two separate search warrants and filed sworn affidavits in which he included the same explicit falsehood that "she stated yes" to a request for consent to search. These subsequent searches produced additional incriminating evidence including 446 grams of methamphetamine.

### STANDARD OF REVIEW

When deciding a motion to suppress, the district court may make findings of fact and conclusions of law. *United States v. Stevenson,* 396 F.3d 538, 541 (4th Cir. 2005). On a motion to suppress, the burden of proof is on the party who seeks to suppress the evidence. *United States*

*v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). However, once the defendant establishes a proper basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## APPLICABLE LAW

The Fourth Amendment to the United States Constitution protects people against unreasonable searches and seizures. U.S. Const. amend. IV. Warrantless searches and seizures are presumptively unreasonable and violative of the Fourth Amendment, subject to limited exceptions. *Katz v. United* States, 389 U.S. 347, 357 (1967). Evidence obtained because of an unreasonable search is therefore inadmissible absent an exception that would allow the Government to introduce it. *See Elkins v. United States*, 364 U.S. 206, 212-13 (1960). The Supreme Court has identified a limited number of exceptions that may permit the government to conduct a warrantless search. Absent one of these exigencies or specific exceptions, evidence seized during an unreasonable warrantless search must be suppressed under the exclusionary rule. *United States v. Calandra*, 414 U.S. 338, 347 (1974).

The automobile exception provides one such exception to the warrant requirement. "Under the automobile exception, the police can search a vehicle without first obtaining a warrant if they have probable cause to believe the car contains contraband or evidence of illegal activity." *United States v. Johnson*, 410 F.3d 137, 143 (4th Cir. 2005) (citing *Maryland v. Dyson*, 527 U.S. 465, 467 (1999)). When an officer conducting a traffic stop smells an illegal substance, like marijuana, he has probable cause to believe the car contains contraband and is entitled to search it. *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016) (citing *United States v. Carter*, 300 F.3d 415, 422

(4th Cir. 2002)). Still, the Government carries the burden of proof in justifying a warrantless search. *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013) (internal quotations omitted).

## SUPPRESSION HEARING

As noted, at the suppression hearing, the Court heard testimony from four witnesses: (1) Officer Logan Skurupey; (2) Officer Tyler Thomas, (3) Trooper Tony Kirkwood; and (4) Kevin Michael Davis. The Court details each witness' testimony generally, and makes findings related to each witness regarding credibility, inconsistent statements, impeachment, and other factors.

### A. Testimony of Logan Skurupey

Officer Logan Skurupey of the Ripley Police Department testified to his involvement in the stop. As detailed herein, significant questions arose regarding the credibility and reliability of his testimony. This testimony, coupled with the course of conduct exhibited both within the body camera footage and admitted to afterward, leaves the Court without substantial confidence in the credibility of his testimony and the procedures utilized throughout the stop, search, and arrest.

After biographical testimony, and that regarding his experience with drug searches and arrests, Officer Skurupey's testimony turned to the night of Ms. Miller's arrest. According to his testimony, he was parked in the median of the interstate, observing traffic, when Ms. Miller passed. He testified that at 9:30 p.m., while parked on the interstate, with her car travelling at least 70 miles per hour, he observed her speeding and simultaneously witnessed her illegal window tint and a malfunctioning registration light. Upon questioning about the implausibility of witnessing all three infractions at the same time while sitting stationary in the rain and dark, Officer Skurupey stood by his claim. While the basis of the stop was essentially unchallenged, the implausibility of his

8

testimony on this issue strains credulity and resulted in close scrutiny of the remainder of his testimony.

Next, he testified to the litany of questions he asked Ms. Miller after initiating the stop. In examining the chronology of his questions and his explanations, the Court finds many of his justifications suspect.  His answers generally left the Court skeptical of his explanations, and his demeanor during cross examination, explaining the litany of questions regarding travel plans, weapons, and potential contraband, was both defensive and somewhat combative.

Additionally, despite the documentary video evidence to the contrary, Officer Skurupey admitted to including an explicit falsehood, related to Ms. Miller's purported consent to the search of her vehicle, in both his report and in multiple search warrant affidavits. The affidavits  included oaths swearing to their truthfulness. When questioned on this, he initially offered that Ms. Miller's action appeared to be a "consensual shrug." Despite this claim, however, he continued to ask questions, and waited to initiate the search until the purported smell of marijuana created the apparent requisite probable cause. His conduct in the video belies the notion that he believed justification for the search, based on consent or otherwise, existed prior to that.  Had he believed the Defendant's "shrug" evidenced consent, it is unclear why, on multiple occasions, he would continue to include the false claim that she affirmatively stated "yes" to grant consent to the search. Further, when asked for explanation after he admitted that it was not true, he explained that he had not caught the error in the report, even though he had written both the report and the affidavits. His willingness to repeatedly include such an important "error" under oath undermines his credibility.

Moreover, sworn falsehoods revealed in his testimony did not end with the written report and affidavits. In sworn testimony to a grand jury, Officer Skurupey testified to the following regarding his conversation with Officer Thomas: "When I walked to the back of her vehicle to run her ID card, my partner walked from the other side of the vehicle and told me that he could smell – *along with Trooper Kirkwood, that they could smell marijuana* coming from the vehicle . . ." (*Logan Skurupey Grand Jury Testimony, Document 57-1) (sealed)*. As clearly evidenced by the video, and conceded by Officer Skurupey under cross-examination, this was plainly untrue.

Finally, in addition to the inconsistent statements, the sworn falsehoods, and the claims which strained credulity, some of Officer Skurupey's documented conduct throughout this case raises concerns regarding his reliability and respect for the Constitutional limitations on his interactions with suspects.  First, as detailed in the factual background above, Officer Skurupey attempted to evade *Miranda* on at least two separate occasions after Ms. Miller had unequivocally invoked her right to an attorney.  Despite this invocation, he attempted to get her to speak with him multiple times and proceeded to question her for several minutes prior to an attorney arriving. Although no statements are the subject of this motion, these efforts clearly violated the dictates of *Miranda* and evidence a lack of respect for the Defendant's constitutional rights. Furthermore, after the evidence was collected, rather than preserving it through proper procedure, Officer Skurupey kept the fake Brisk Iced Tea can, which had contained some of the drugs, on an elevated hutch above his desk.  He acknowledged, without hesitation, that he did so to keep it as a trophy.

Officer Skurupey's conduct, false sworn testimony in affidavits and before the grand jury, and suppression testimony inconsistent with the video, leaves the Court with little or no confidence

in the credibility of his testimony and/or that he followed proper procedure throughout the interactions.

### B. Testimony of Tyler Thomas

The Court next heard from Officer Tyler Thomas, who at the time of the challenged search, was a patrolman with the Ripley Police Department. During the hearing, the Court observed significant and consistent credibility and reliability issues with nearly every aspect of his testimony. The breadth of the impeachment of his testimony, coupled with the additional evidence of Officer Thomas' conduct throughout the stop and arrest, severely undermine the Court's ability to credit his testimony on any issue.

Officer Thomas, despite wearing a body camera, either did not initiate a recording, or failed to properly preserve the recording. As a result, the Court has limited visibility into the precise conversations he had outside of the view of Officer Skurupey's camera, and therefore, the accuracy of his claims must be evaluated largely based on an assessment of the credibility of his testimony. Due to some implausible conclusions, inconsistent testimony, contradictions with the video evidence, and direct contradictions with prior sworn testimony, the Court finds Officer Thomas' testimony lacking in credibility.

Just eleven days after the incident, on July 22, 2021, Officer Thomas testified in a preliminary hearing in Jackson County in the state proceeding against the passenger, Mr. Davis. (Transcript of Preliminary Hearing, *State of West Virginia v. Kevin Michael Davis,* 21-M18F-00185, Def Ex. 7, Document 58-6) [hereinafter "Preliminary Hearing Transcript"]. The transcript of the hearing reveals substantial sworn contradictions, both with the video and with his testimony in the suppression hearing that severely undermine Officer Thomas' credibility.  This, together

11

with the ease with which contradictory statements were made under oath during the suppression hearing, his course of conduct exhibited during the stop and arrest of the Defendant, and the lack of corroboration of much of his testimony, result in the Court discounting his testimony in its entirety.

As an example, when Officer Thomas testified to the speed of Ms. Miller's vehicle during the suppression hearing, he stated that he believed she was speeding. When asked if the car was travelling faster than other vehicles nearby, he answered affirmatively, and stated that she was in the fast lane.  However, this directly contradicted his previous sworn testimony at the preliminary hearing. There, he stated, regarding Ms. Miller's vehicle, "[i]t was driving slowly, not keeping up with traffic." (Preliminary Hearing Transcript, p.6). At that time, he doubled down on the point. When informed that the criminal complaint stated that the car was "traveling at a high rate of speed" and asked if that was accurate, he said "No, sir. It was slower…normally, when that happens, they'll slow down in front of us[]." (Preliminary Hearing Transcript, p.6-7).

The inconsistencies continued. At the suppression hearing, Officer Thomas testified that he initially noticed a "faint smell" or slight odor of marijuana but when she rolled down the windows, he noticed a "big whiff" or strong odor of marijuana. However, at the preliminary hearing the smell was portrayed differently. There, he stated that only once the windows were all rolled down, did he "smell[ed] a slight odor of marijuana coming from the vehicle." (Preliminary Hearing Transcript, p.7-8). Further, at the suppression hearing, he confirmed during cross-examination that, in reviewing the video of his interaction with Officer Skurupey prior to the search, Officer Skurupey never mentioned anything about Ms. Miller purportedly consenting to a search. This reality is borne out in the body camera footage, as well. (Skurupey Bodycam Footage,

pt. 1, at 00:01:54-00:02:03). However, he falsely testified differently at the preliminary hearing. There, his testimony was that when he went to the back of the vehicle, "[Officer Skurupey] told myself that he got permission to search – consent to search the vehicle." (Preliminary Hearing Transcript, p.8).[4]

Officer Thomas testified at the hearing that after he informed Officer Skurupey about the smell, he returned to the vehicle and spoke with Mr. Davis.  During that period, he testified that Mr. Davis admitted to smoking marijuana in the vehicle approximately 20 to 30 minutes before the stop and that he had flicked the marijuana remains out of his window.[5]  However, this, of course, was not captured on the video. Additionally, examination of the video from Officer Skurupey's body camera during the period when Officer Thomas supposedly had this conversation shows Trooper Kirkwood conversing with Mr. Davis, rather than Officer Thomas conversing with Mr. Davis.  Under questioning, Officer Thomas conceded that the video appears to show him not speaking with Mr. Davis, during this pre-search period, but he continued to insist that the conversation took place.[6] Moreover, this critical conversation supposedly happened out of earshot

---

4 The Court also notes that at numerous times during Officer Thomas's testimony, rather than acknowledge that he had said something inaccurate in the previous testimony, he instead agreed with Defense Counsel that "that's what the audio says," seemingly attempting to deflect from the fact that the audio was of his very own voice. This evasiveness further eroded confidence in his credibility.

5 In its response to the motion to suppress (Document 40), the United States asserted that *both* Officer Thomas and Trooper Kirkwood recalled Mr. Davis admitting to having smoked marijuana. The response stated that the United States learned of the purported admission while "separately speaking with Patrolmen Thomas and Skurupey in preparation for the suppression hearing." However, at the suppression hearing the United States retracted this statement and clarified that it would only be the testimony of Officer Thomas, and not that of Trooper Kirkwood.

6 The conversation presents numerous questions, in the breadth of what was apparently discussed during that brief period where Officer Thomas does not even appear to be speaking with Mr. Davis. First, he apparently learned that Mr. Davis had smoked marijuana 20-30 minutes earlier and thrown the rest of the marijuana out the window. Additionally, where he claims the inquiry stopped is also strange. He states that he did not inquire if there was additional marijuana in the car, he did not inquire if there was any paraphernalia in the car, and he did not inquire if Ms. Miller had smoked. All of these details would seem highly relevant to both determinations of probable cause and the investigation. His claims to have so limited the conversation solely to this critical and never discussed admission raises questions.

of the only body camera utilized during the stop, while that camera was capturing the driver of the vehicle vehemently denying the presence of marijuana and stating that Mr. Davis did not use marijuana.

Additionally, this purported damning admission was never mentioned in the entirety of the bodycam footage, and it was never mentioned in the police report. It is difficult to accept (given all of the other credibility issues) that such a critical piece of corroborating evidence was discussed among the officers, and then Officer Skurupey would decline to include it in his report or subsequent search warrant affidavits.  Further, despite his extensive testimony in Mr. Davis' preliminary hearing about his conversations with Mr. Davis during the incident, Officer Thomas made no mention of this critical admission. This piece of evidence would have confirmed the purported smell, and possibly solidified the probable cause justifying the search, yet it was never mentioned in any record anywhere until the United States filed its response to this motion.

Finally, in addition to the issues detailed above, some of Officer Thomas' conduct presents reliability issues and questionable tactics which further cement the Court's conclusions. First, the Court is disturbed by Officer Thomas' apparent attempt to leverage hydration of a suspect in custody to evade *Miranda's* dictates.  When he was informed that Officer Skurupey did not want to give Ms. Miller the requested Mountain Dew on a hot day, after they had been searching the car for over thirty minutes, Officer Thomas decided to pitch utilizing that in an effort to manipulate Ms. Miller.  He stated, "I'm just wondering if we coddle her a little bit, she'll fuckin', maybe she'll start talking." (Skurupey Bodycam Footage, pt. 2, at 00:21:59). This comment, attempting to utilize hydration to get Ms. Miller to waive her right to an attorney, which she had already invoked, exhibits behavior that raises significant questions about the Officer's conduct and protocol.

14

Further, as documented above, when Officer Skurupey entered the secure room where Officer Thomas was sitting at the station, the first and only thing Officer Thomas says before the video ends is "[t]urn it off if you can." (Skurupey Bodycam Footage, pt. 5, at 00:08:20). While there may be some alternate, non-troubling, explanation for why the Officer would so quickly insist that a body camera should be turned off, given Officer Thomas's failure to retain body camera footage of the incident, and the litany of other inconsistencies, this comment presents further cause for the Court's concern.

*C. Testimony of Tony Kirkwood*

The final United States witness was Trooper Tony Kirkwood of the West Virginia State Police, who was the third officer involved in the stop. Unlike the other officers, Trooper Kirkwood's testimony was left unimpeached, and the Court found that it was largely credible.

After explaining the initial aspects of his credentials and the stop, Trooper Kirkwood discussed how he spoke with Mr. Davis on the passenger side of the vehicle. He did not testify to an admission by Kevin Davis that he had smoked marijuana 20-30 minutes prior to the stop. Trooper Kirkwood acknowledged that he did not recall the timing of smelling marijuana, and whether it was before or after Mr. Davis had been removed from the vehicle and the search had begun. However, he indicated that he encountered the smell by entering the vehicle. He testified: "I do believe that Patrolman Thomas indicated that he smelled marijuana coming from the vehicle. And I then stuck my head in the vehicle and, and smelled it as well. But I can't remember if that was before or after I pulled [Davis] out." (Trooper Kirkwood Suppression Hearing Testimony). Ultimately, Trooper Kirkwood's testimony was sufficiently consistent and unimpeached to be viewed as credible by the Court.

### D. Testimony of Kevin Michael Davis

The only Defense witness was Kevin Michael Davis, the passenger in the Defendant's vehicle. While some central aspects of his testimony were left unimpeached, substantial credibility questions arose throughout his testimony that significantly diminished the reliability of his testimony. Mr. Davis denied ever using marijuana in the car, and ever being asked about smoking marijuana by Officer Thomas. However, on cross-examination, he offered untruthful answers to questions about drug use. First, he testified plainly that Ms. Miller was not his drug dealer, but when presented with text messages, admitted that she had, in fact, supplied him with drugs.

He attempted to explain his untruthful answer by stating that he did not view her as a drug dealer but conceded that his answer was untruthful. Additionally, he appeared evasive and as though he was avoiding telling the full truth as he knew it when questioned about Ms. Miller's activities the night before the arrest, her interest in acquiring marijuana edibles, and other aspects of their night. Given the totality of the testimony, the Court cannot deem his testimony sufficiently credible to give it much weight.

### DISCUSSION

Both the Defendant and the United States spend significant portions of their briefing discussing whether the traffic stop was impermissibly extended during Officer Skurupey's questioning of the Defendant. However, prior to reaching that question, the Court first examines whether legal justification ever existed for the search, because absent a legal justification for the search which uncovered the incriminating evidence, the length and scope of the stop is irrelevant to the instant motion. Thus, the Court turns to the potential legal justifications offered for the search.

16

*A. Probable Cause*

The Government's primary justification for the search rests on a finding of probable cause. The claim of probable cause rests centrally on the purported smell of marijuana.  Because that is not evidence that can be *seen* in video, the Court's determination of whether the Government has met its burden to prove by a preponderance of the evidence that probable cause existed hinges primarily on the credibility and reliability of the testimony, viewed in the context of the rest of the evidence.

Given the extensive credibility concerns from Officer Thomas's testimony detailed above, the lack of any corroborating video evidence, and the fact that no marijuana was found during the search, the Court finds that the United States has failed to meet its burden.  There is insufficient credible evidence to hold that a preponderance of the evidence supports a finding that the odor of marijuana was detected by Officer Thomas and probable cause was established.

Additionally, while Trooper Kirkwood's testimony retains far more credibility than that of the other witnesses, his testimony revealed why his purported detection of the smell of marijuana is insufficient to justify the search. While he did not know precisely if he detected the smell of marijuana before or after the search was initiated, his testimony illustrates the answer. To the extent he smelled it before they verbally informed the Defendant and passenger that they were initiating the search, he explicitly stated that he did not smell the marijuana until he *stuck his head in* the car. At the very moment he stuck his head in the car, in order to specifically search for the odor of marijuana, he was engaged in a search of the interior of the vehicle and had crossed the plane of the vehicle from the permissible vantage point outside the window. Thus, because he did not smell

17

marijuana until he was already carrying out a search, his detection of the odor does not impact the Court's conclusions regarding the existence of probable cause *prior* to the search.

The United States raises two alternative grounds to establish probable cause. However, neither establishes probable cause. First, the United States points to the loaded syringe located on Mr. Davis. While it is true that a syringe with methamphetamine could support probable cause to search the vehicle, this syringe was found *after* the officers informed the Defendant and Mr. Davis of the smell of marijuana, detained them, and initiated the search process.[7] Accordingly, because probable cause is measured at the inception of the search, the presence of the syringe found after the search began is not relevant. Of course, the United States is correct that law enforcement officers may, for the purpose of officer safety, remove a passenger from a vehicle. However, that is not what happened here. The officers did not remove Mr. Davis from the vehicle and were simply questioning him until the purported smell of marijuana. At that point, the officers removed him from the vehicle and located the loaded syringe. In context, it is apparent that he was removed, not for officer safety, but to initiate the search of the vehicle premised on the smell of marijuana.

The same reasoning is true of the United States' argument that the Defendant's arrest warrant supported the probable cause. The United States argues in its brief that "less than four minutes" after Officer Skurupey began speaking with Ms. Miller, he discovered her outstanding arrest warrants. (Document 40) However, this ignores the fact that the search was initiated *less than three minutes* after he began speaking with Ms. Miller, and he informed her they were

---

[7] To the extent, instead, that the United States is relying upon Trooper Kirkwood seeing a box of unopened syringes in the car in original packaging, before the search, the Defendant correctly noted this Court's previous observation related to syringes with no evidence of their use for illegal drugs. This Court has held that absent some admission that the syringes are being used for illegal purposes, some evidence of their use, some municipal code barring their possession, or some other factor, mere possession of syringes is not inherently evidence of contraband. *See United States v. Bumgarner*, 2021 WL 6007124 at *9-10 (S.D.W. Va. 2021).

conducting a probable cause search.  Moreover, the evidence revealed that the warrant was a non-extraditable warrant from Ohio.  Accordingly, the existence of the warrant did not factor into the determination of probable cause.

Ultimately, the Court concludes that the United States has failed to prove, by a preponderance of the evidence, that sufficient credible evidence existed to establish probable cause justifying the initial search. Accordingly, absent some other justification, the evidence obtained as a result must be suppressed.

B.  *Consent*

Further, while the United States did not rely upon the purported consent to search the vehicle in its briefing, it noted that the United States believes the Defendant's shrug can be construed as consent sufficient to justify the search. However, viewed in the totality of the circumstances, the Court finds that this was not a consensual search. While it is true that non-verbal consent can sometimes be sufficient to constitute consent, not even Officer Skurupey appeared to believe the conduct constituted consent.  After asking if she consented to the search, he proceeded to ask many more questions, and continued to act as though he did not have authority to search the vehicle. This changed once he learned of the purported smell of marijuana. The non-verbal conduct was not relied upon by the officers at the scene and should not be used to supplant a rationale that did not exist at the time.  In addition, upon review of the video, the Court finds that no reasonable officer would interpret Ms. Miller's body language as consent to a search of her vehicle.

Thus, because no justifiable grounds exist for the search, whether the stop was impermissibly extended is immaterial. Even assuming that the stop was not impermissibly

extended, the United States has failed to prove by a preponderance of credible evidence that a legal justification for the initial search existed. *See Matlock*, 415 U.S. at 177 n.14 (explaining Government's burden). Therefore, the evidence must be suppressed.

### C. Scope of Suppression

While some of the evidence was obtained through the initial search, law enforcement sought and obtained two separate search warrants which uncovered additional evidence. In its briefing, the United States questioned what evidence, specifically, the Defendant sought to be suppressed. In response, the Defendant argued that all evidence should be suppressed as either illegally obtained or fruit of a poisonous tree. The Defendant is correct.

Initially, under the exclusionary rule, all the evidence obtained as a result of the initial search must be suppressed. *Calandra*, 414 U.S. at 347. Additionally, any evidence obtained because of the subsequent search warrants must also be suppressed, as it would not have been possible to obtain it absent the initial illegality, and it derives directly from that improper search. *See Wong Sun v. United States,* 371 U.S. 471, 484-86 (1963). First, the search warrants were admittedly premised on an explicit falsehood about the Defendant's consent to the search. This alone creates significant concerns about the propriety of the warrant. Additionally, they were also presumably premised heavily on the evidence obtained as a result of the initial search. Further, law enforcement would not have had the car impounded to even apply for the search warrants absent the initial search. Thus, given that any subsequent searches were directly derivative of the initial search, especially coupled with the admittedly falsified information contained in both warrant applications, the Court finds that all evidence seized from the vehicle must be suppressed.

## CONCLUSION

Wherefore, after careful consideration, the Court **ORDERS** that the *Defendant's Motion to Suppress Evidence* (Document 35) be **GRANTED**, and that the evidence detailed in the *Motion* be suppressed.  Further, the Court **ORDERS** in the event this is the only charge on which the Defendant, Kelley Jean Miller, is being held, that she be **RELEASED IMMEDIATELY**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER:   August 15 2022

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA